IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

01 MAY 21  PM 3: 38

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JIMMY CLARK TAYLOR and | ) | |
| DEBORAH CARTER TAYLOR, | ) | |
| | ) | |
| Debtors, | ) | CIVIL ACTION NO. 00-G-3151-E |
| | ) | |
| DEBORAH TAYLOR, | ) | |
| | ) | |
| Appellee, | ) | **ENTERED** |
| | ) | |
| v. | ) | **MAY 2 1 2001** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| Appellant. | ) | |

## MEMORANDUM OPINION

### INTRODUCTION AND STATEMENT OF ISSUES BEFORE COURT

The above-styled case is on appeal from the United States

Bankruptcy Court for the Northern District of Alabama, Eastern Division on the

order of the bankruptcy court by which it awarded Ms. Deborah Carter Taylor

$12,000.00 in emotional distress damages and $31,723.97 in attorney fees against

13

the United States of America Department of Education [hereinafter Education].[1]

The case is before this court on appeal on the following issues:

1)   Whether 11 U.S.C. § 5252(c) implicitly voids a lender's right under 11 U.S.C. § 365(e)(2)(B) to refuse post-petition to disburse funds due under a pre-petition loan agreement;

2)   Whether Education's regulations which require a borrower who files a bankruptcy to reapply for an un-insured student loan and to show either extenuating circumstances or to provide a co-signor to overcome the adverse credit history of bankruptcy are equivalent to denial of the loan violating 11 U.S.C. § 525(c);

3)   Whether a lender which denies a student loan on account of a prior loan delinquency, which unknown to the lender had been discharged in bankruptcy, violates 11 U.S.C. § 525(c) by failing to investigate and determine whether the delinquent debt had been discharged;

4)   Whether 11 U.S.C. § 525(c) affords a private right of action for damages, and if not, whether the bankruptcy court's power under 11 U.S.C. § 105 supplies the missing substantive right of action;

5)   Whether emotional distress damages are recoverable for violations of 11 U.S.C. § 5252(c), especially where they are not corroborated by evidence of medical treatment;

6)   Whether the bankruptcy court erroneously awarded plaintiff $12,000.00 in emotional distress damages as unsupported by the record and the case law;

---

[1] *In re Taylor*, 252 B.R. 201 (Bankr. N.D. Ala. 2000).

7)    Whether the bankruptcy court has jurisdiction to award attorney fees pursuant to the Equal Access to Justice Act; and

8)    Whether the position of Education is substantially justified, especially where its statutory construction is "compelling" and is an "issue of first impression."

Discussion of each issue and pertinent governmental programs, regulations, and statutes will follow.

## PLUS LOAN PROGRAM [2]

The enumerated issues before the court deal with provisions of and application of the Parent Loan for Undergraduate Students [hereinafter PLUS] program and related regulations as they relate to other federal statutes, particularly application of 11 U.S.C. § 525(c)(1) of the Bankruptcy Code. The Higher

---

[2] PLUS loans are one of four types of loans offered pursuant to the Federal Family Education Loan Program (FFELP), 20 U.S.C. § 1078-2. Of the four type loans only PLUS loans are restricted to borrowers who do not have an adverse credit history. 20 U.S.C.§ 1078-2(a). This restriction on PLUS loans is the sole criterion and is comparable to commercial loans which are also based upon an applicant's income and ability to repay. Congress has refused to override Education's definition of "adverse credit history" on two occasions. Education published its regulations on October 7, 1994. Congress enacted § 525(c)(1) by Public Law No. 103-394 on October 22, 1994. *See* Pub. L. No. 103-394, § 313, 108 Stat. 4106, 4140-41 (1994); 59 FR 51346, October 7, 1994.

Section 419 of the most recent re-authorization of the Higher Education Act (HEA) on October 7, 1998, re-enacts the same requirement and expressly authorizes the Secretary to establish additional eligibility criteria. Pub. Law No. 105-244.

3

Education Amendments of 1992, 20 U.S.C. § 1078-2, provides, in part, the

following:

> **(a) Authority to Borrow**
>
> > **(1) Authority and eligibility**
> >
> > Parents of a dependent student shall be eligible to borrow funds
> > under this section in amounts specified in subsection (b),
> > if-
> >
> > **(A)** the parents do not have an adverse credit history as
> > determined pursuant to regulations promulgated by the
> > Secretary; and
> >
> > **(B)** the parents meet such other eligibility criteria as the
> > Secretary may establish by regulation, after consultation
> > with guaranty agencies, eligible leaders, and other
> > organizations involved in student financial assistance.

20 U.S.C. § 1078-2 **(a)**(1)(A) & (B).

The Code of Federal Regulations defines "eligible borrowers" and

"adverse credit history."  A parent borrower such as Ms. Taylor is defined

accordingly:

> *Parent borrower.*  (1)  A parent borrower, is eligible to receive a
> PLUS Program loan, other than a loan made under § 682.209(e), if
> the parent -
> > (i) Is borrowing to pay for the educational costs of a dependent
> > undergraduate student ...

34 CFR § 682.201(b)(i).

The Regulations go on to define "adverse credit history" as follows:

(vii)(A)  In the case of a Federal PLUS loan made on or after July 1, 1993, (if the parent) does not have an adverse credit history.
...
(C)  Unless the lender determines that extenuating circumstances existed, the lender must consider each applicant to have an adverse credit history based on the credit report if --

    1)    The applicant is considered 90 or more days delinquent on the repayment of a debt;

    2)    The applicant has been the subject of a default determination, bankruptcy discharge, foreclosure, repossession, tax lien, wage garnishment, or write-off of a Title IV debt, during the five years preceding the date of the credit report.

34 C.F.R. § 682.201(b)(vii)(C).  Thus, only with extenuating circumstances would a person who was the subject of a bankruptcy discharge not have an adverse credit history.

## 11 U.S.C. § 525 (c)(1)

Plaintiff has brought the instant case alleging violations of 11 U.S.C. § 525(c)(1).  Section 525(c)(1) of the Bankruptcy Code states in pertinent part the following:

A governmental unit that operates a student grant or loan program and a person engaged in a business that includes the making of loans guaranteed or insured under a student loan program may not deny a grant, loan, loan guarantee, or loan insurance to a person that is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act. ...

11 U.S.C. § 52(c)(1).

## DEAR COLLEAGUE LETTER

Following enactment of the Bankruptcy Reform Act of 1994 which added 11 U.S.C. § 525(c)(1), Education issued a Dear Colleague Letter [hereinafter DCL] to guaranty agencies regarding possible changes to loan programs as a consequence of changes in the bankruptcy law. The DCL advised these agencies that PLUS applicants, among other applicants, continued to have an adverse credit history and were thus ineligible for the loans. Mitigating circumstances or the signature of a creditworthy endorser would rebut the negative inference suggested by the prior discharge.[3]

## HISTORY OF CASE AT BAR

Ms. Taylor filed an adversary proceeding against Chase Manhattan Bank, N.A. [hereinafter Chase] on August 19, 1997, alleging a violation of 11 U.S.C. § 525(c)(1), pertinent portions of which have been previously set forth. Chase filed a motion to dismiss which the court denied on March 30, 1998. On November 11, 1998, Education filed a motion to intervene for the limited purposes of addressing certain legal issues. The court granted the motion to intervene on January 19, 1999. On March 25, 1999, plaintiff filed an amended complaint in which she alleged that both Chase and Education violated § 525(c)(1). She

---

[3] Although Congress has had the opportunity to override Education's definition of "adverse credit history" it has not done so.

6

requested emotional distress damages and asserted that her complaint should be treated as a class action. The parties filed cross motions for summary judgment and defendants moved to dismiss the class action lawsuit. On June 22, 1999, the court denied Education's motion to dismiss and/or for summary judgment. In January 2000, Ms. Taylor and Chase entered into a settlement agreement in which Chase agreed to pay Ms. Taylor $12,000.000. Chase was subsequently dismissed as a co-defendant.

Trial was held May 11, 2000, and the court issued its decision granting Ms. Taylor $ 12,000.000 on June 26, 2000.[4] Plaintiff submitted an application for attorney fees which the court granted, in part, after oral argument on August 8, 2000. Judgement was entered August 10, 2000. Education timely filed its appeal.

At trial, the following facts were stipulated by the parties:[5]

---

[4] *In re Taylor*, 252 B.R. 201. (N.D. Ala. 2000).

[5] Supplemental material found in the footnotes was not part of the stipulated facts. Stipulated facts are recorded in *In re Taylor*, 252 B.R. at 202-203.

1)   On June 26, 1996, Chase approved PLUS loan with disbursements scheduled for July 1996 and January 1997. The first disbursement was made.[6]

2)   On or about November 7, 1996, plaintiff Deborah Cater Taylor filed the above-styled Chapter 7 case.[7]

3)   As early as November 22, 1996, a determination that the loan was non-dischargeable was made by the defendant or others pursuant to the defendant's orders or requirements.

4)   Ms. Taylor has taken no action as of this date to obtain a determination that her debt to Chase was dischargeable under 11 U.S.C. § 523 or otherwise and said debt is excepted from discharge under 11 U.S.C. § 523(a)(8).

5)   On January 7, 1997, a decision was made by the defendant, or others pursuant to defendant's instructions and requirements that the second disbursement approval of the promissory note signed prior to the filing of the bankruptcy was removed.[8]

6)   On February 27, 1997, a discharge of the debtors was entered in the above-styled bankruptcy case.[9]

---

[6] The loan was approved on behalf of Ms. Deborah Taylor's son Jason L. Taylor who was a student at the University of the South [hereinafter Sewanee].

[7] Mr. Taylor had lost his job as president of the bank.

[8] On January 21, 1997, Sallie Mae canceled the second distribution of the PLUS loan because plaintiff had filed for bankruptcy.

[9] Sallie Mae received notice that Ms. Taylor's bankruptcy had been discharged on March 4, 1997. Sallie Mae's Correspondence History did not indicate which debts were discharged and which ones were not. On March 18, 1997, Sallie Mae requested and received a credit report of Ms. Taylor from Trans Union. The credit report indicated that Ms. Taylor had three bad debts placed for collection (First Bankcard, MBNA America, and Discover Card - R09), but Sallie

7)  Prior to the debtor's bankruptcy plaintiff Deborah Carter Taylor entered into a promissory note for a loan from the Tennessee Student Assistance Corporation which was funded by Chase.

8)  Said loan was for the purpose of assisting plaintiff's son with tuition and other expenses of attending Sewanee in Sewanee, Tennessee.

9)  Said loan was approved by Chase by letter dated June 20, 1996.

10)  On February 28, 1997, plaintiff was advised by Sewanee that Chase had canceled the second distribution of the loan because plaintiff was filing bankruptcy.[10]

11)  On or about March 6, 1997, Ms. Taylor reapplied for a PLUS loan in the amount of Five Thousand Dollars ($5,000.00).

12)  By letter dated March 17, 1997, plaintiff was requested to commence payments on the outstanding funding of the loan with the repayment period beginning on March 5, 1997, and the first payment in the amount of $65.90 due on April 13, 1997.

13)  No additional financial information on the plaintiff other than her bankruptcy was obtained by defendant or anyone acting under its instructions or requirements until March 18, 1997.

_____

Mae did not consider these accounts to be " adverse" because of the "bankruptcy" notation with regard to those debts. The March 18, 1997, credit report did, however, indicate that Ms. Taylor's payment in the amount of $2065.00 on an installment loan by the City Bank of Childersburg [hereinafter City Bank] was more than 120 days past due. This debt had no bankruptcy notation.

[10] Sewanee informed plaintiff she could reapply for a new PLUS loan in that amount from Chase.

14) By letter dated March 18, 1997, Chase advised plaintiff that the reasons that her application for the balance of her loan was canceled were because of her bankruptcy and default on a loan.

15) Plaintiff obtained funding for her son's tuition and expenses from her parents on or about April 8, 1997.

16) In its March 18, 1997, letter Chase advised plaintiff that Ms. Taylor would be eligible to reapply for a PLUS loan if she obtained an endorser with an acceptable credit history or if she provided the servicing company with an updated credit report indicating that all accounts were either current or that the adverse credit condition had been resolved. The letter also stated that Sallie Mae would consider her application if she provided a written statement from her creditor stating that she had made satisfactory arrangements to repay the debt.

17) Plaintiff's own records indicate she obtained an endorser for the second PLUS loan on April 2, 1997. Ms. Taylor did not submit the endorsement form to Sallie Mae.[11]

The trial court added to the stipulated facts by its own findings,[12]

listed below:

1) Sallie Mae denied the second disbursement of plaintiff's PLUS loan on January 21, 1997, because plaintiff had filed bankruptcy.

2) Sallie Mae denied the second loan application on March 18, 1997, because the Trans Union credit report indicated

_____

[11] Ms. Taylor did not contact Sallie Mae after it declined to grant her application for a second loan, nor did she request Sallie Mae to reconsider her loan application.

[12] 252 B.R. at 203-04. In the published opinion these "facts" are numbered 18-23.

plaintiff's debt to the City Bank of Childersburg [hereinafter City Bank] was delinquent.

3)    Plaintiff's debt to City Bank was discharged on February 27, 1997.

4)    Plaintiff's husband lost his job as president of a local bank. The loss of income jeopardized the ability of the son to remain in college.

5)    Sewanee notified plaintiff and her son that the student loan was canceled and that the son would be barred from attending classes.

6)    The inability to protect her son from the adverse consequences of the father's loss of job caused plaintiff great anguish and emotional distress. She suffered with headaches, loss of sleep and lack of concentration. She withdrew and often cried. Her performance as a high school math teacher suffered. She did not receive any medical treatment for these conditions.

## DISCUSSION OF ISSUES BEFORE THE COURT

## I. SECTION 525(c) PERMITS DISCRIMINATION

### A.    The Plain Language of § 525(c)(1) Does Not Prohibit Discrimination Based Upon Bankruptcy In The Granting of Student Loans

While it is true that section 525(c)(1) prohibits lenders from denying loans solely because of bankruptcy, the section does not prevent lenders from taking bankruptcy into consideration in the granting of PLUS loans. Congress had the opportunity to prohibit discrimination in the granting of student loans had it so

11

desired. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114S. Ct. 1757, 128 L.

Ed. 2d 556, 564 (1994) ("[I]t is generally presumed that Congress acts

intentionally and purposely when it includes particular language in one section of

a statute but omits it in another"); *City of Chicago v. Environmental Defense

Fund,* 511 U.S. 328, 338, 114 S. Ct. 1588, 128 L. Ed. 2d 302 (1994). Given the

clear contrast between §§ 525(a)[13] and 525(c)(1), Congress did not prohibit the

wide variety of activities prohibited by § 525(a), including discrimination.

Although 34 C.F.R. § 682.201 and the DCL permit discrimination

with respect to the granting of PLUS loans, they do not require the denial of PLUS

loans to applicants who have declared bankruptcy.  Unless extenuating

circumstances exist the lender must consider each applicant to have an "adverse

credit history" based on the credit report.  The DCL and 34 C.F.R. § 682.201

specifically permit the lender to consider extenuating circumstances which could

mitigate the adverse inference suggested by the bankruptcy filing.  34 C.F.R.

---

[13]  Section 525(a) provides that
    [A] governmental unit may not deny, revoke, suspend, or
    refuse to renew a license, permit, charter, franchise, or
    other similar grant to, condition such a grant to,
    discriminate with respect to such a grant against, deny
    employment to, terminate the employment of, or
    discriminate with respect to employment against, a
    person that is or has been a debtor under this title or a
    bankrupt or a debtor under the Bankruptcy Act ... .

§ 682.201(b)(vii)(C).[14]  In addition the DCL provides the applicant the opportunity

to obtain the signature of a creditworthy endorser in order to receive a PLUS loan.

34 C.F.R. § 682.201(b)(viii).[15]

### B.  The Plain Language of § 525(c)(1) Controls Its Interpretation

Although the legislative intent indicates that Congress intended to

prohibit discrimination when it enacted § 525(c)(1),[16] § 525(c)(1) is a stand alone

section.  Legislative history further indicates that the intent was to prevent

discrimination for future student loans based on the discharge or nonpayment of a

"prior" student loan.  This is not the case in the instant action.  Denial of

Ms. Taylor's loan was based on her negative credit history: bankruptcy filing.  She

was not discriminated against because of her nonpayment or discharge of a prior

student loan.

---

[14]  Applicant can show that the debt was not in fact owed or that the debt
was paid or settled. 34 C.F.R. § 682.201(b)(vii)(C) & (F).  Debtors in bankruptcy
frequently pay or settle some or all of their debts which could easily rebut a
negative inference suggested by bankruptcy.  Section F requires the lender to keep
documentation demonstrating its basis for determining extenuating circumstances
existed.

[15]  The endorser must not have an "adverse credit history."

[16]  *See* H.R. Rep. No. 103-835, at 58 (1994), *reprinted in* 1994
U.S.C.C.A.N. 3340, 3367 (indicating that the section overruled *In re Goldrich*,
771 F.2d 28 (2nd Cir. 1985), which held that § 525(a) did not apply to student
loans).

When it is impossible to reconcile legislative intent with the language

of the statute, the plain language of the statute must prevail. *Ratzlaf v. United*

*States*, 510 U.S. 135, 147-48, 148 S. Ct. 655, 126 L. Ed. 2d 615, 626 (1994)

(refused to "cloud a statutory text that is clear" with legislative history); *National*

*Coal Association v. Chater*, 81 F.3d 1077, 1082 (11th Cir. 1996)( "Legislative

history and general purpose of the Act do not overcome its plain statutory

language."); *Matter of Poole Funeral Chapel, Inc.*, 63 B.R. 527, 532 (Bankr. N.D.

Ala. 1986).  The language of § 525(c)(1) is clear: a lender is prohibited from

denying a student loan to a person who is or has been a debtor under the

Bankruptcy Code, but the applicant is not discriminated against on the basis of his

bankruptcy status.  He is able to prove himself an acceptable credit risk.

### C.    The Bankruptcy Court Erred In Concluding That Discrimination Is Equivalent To The Denial Of A Student Loan

The bankruptcy court concluded that 34 C.F.R. § 682.201(b) defines

"adverse credit history" to include bankruptcy and combined with

20 U.S.C. § 1078-2(a), the language of § 525(c) was violated because it authorized

lenders to deny student loans based on whether an applicant has filed bankruptcy.

Section 682.201(b)(i), previously set forth,  defines those with

adverse credit histories.  They are presumptively bad credit risks because of their

past failure to pay their debts. Extenuating circumstances, however, can be taken into account to demonstrate that they are good credit risks, and they may obtain a creditworthy endorser, if necessary, to obtain the loan.

In the case at bar the bankruptcy court is requiring that bankruptcy debtors be treated better than others with bad credit histories. Nothing in § 525(c)(1) leads to that improbable conclusion.

## II.   **The Bankruptcy Court Erred In Failing To Take Into Account § 365(2)(2)(B), Which Permits The Termination Of An Executory Contract After The Commencement Of A Bankruptcy Proceeding**

The Taylor Court found that Ms. Taylor's "second loan disbursement was canceled because Sallie Mae had been notified of Ms. Taylor's bankruptcy." It held that cancellation of the second disbursement of the original loan violated § 525(c) of the Bankruptcy Code, but it failed to take into account § 365(2)(2)(B) of the Bankruptcy Code which carves out an exception to § 365(e)(1)[17] when there

---

[17]   Section § 365(e)(1) states:

Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, ... at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on -

**(A)**   the insolvency or financial condition of the debtor at any time before the closing of the case;

15

is a commencement of a case under this title.  The section 365(e)(2)(B) exception

explicitly states:

> **(2)** Paragraph (1) of this subsection does not apply to an executory
> contract or unexpired lease of the debtor, whether or not such contract
> or lease prohibits or restricts assignment of rights or delegation of
> duties, if -
> ...
> **(B)** such contract is a contract to make a loan, or extend other debt
> financial accommodations, to or for the benefit of the debtor, or to
> issue a security of the debtor.

11365(e)(2)(B).

Courts have held that § 365(e)(2)(B) allows for the termination of a

contract to make a loan after the commencement of a bankruptcy case.  *Watts v.*

*Pennsylvania Housing Finance Co.*, 876 F.2d 1090 (3rd Cir. 1989) (Under sections

365(c)(2) and § 365(e)(2)(B) of the Code, the § 362 automatic stay provisions do

not apply);  *In re New Town Mall*, 17 B.R. 326, 327 (Bankr. D.S.D. 1982) (Life

insurance company is entitled to exercise the termination provisions of a mortgage

commitment in light of 11 U.S.C. § 365(e)(2)(B).).

------------------------------

> **(B)** the commencement of a case under this title; or
>
> **(C)** the appointment of or taking possession by a
> trustee in a case under this title or a custodian
> before such commencement.

11 U.S.C. § 365(e)(1).

Section 365(e)(2)(B) clearly permitted Sallie Mae to terminate its loan agreement with Ms. Taylor prior to the second disbursement. The PLUS loan agreement was a pre-petition executory contract between Ms. Taylor and Chase entered into prior to the time the Taylors declared bankruptcy. Performance was due on both sides at the time Sallie Mae terminated the agreement in February 1997.[18]

In light of § 365(e)(2)(B), there is no basis to conclude that § 525(c) required Sallie Mae to disburse additional funds under the pre-petition PLUS loan agreement. Accordingly, contrary to the findings of the bankruptcy court, no violation of § 525(c) occurred when Sallie Mae canceled the second disbursement of the loan.

**III.** **The Bankruptcy Court Erred When It Concluded That Section 525(c) Was Violated Because Ms. Taylor Was Required to Demonstrate Extenuating Circumstances Or To Provide A Co-Signor To Overcome The Adverse Credit History of Bankruptcy**

    **A.** **The Court Erred In Concluding That The Regulations, 34 C.F.R. § 682.201(b)(vii), Violate 11 U.S.C. § 525(c) As A Matter Of Law**

---

[18] Sallie Mae was required to make a second disbursement had there been no bankruptcy filing or adverse credit history or other disqualifying condition. Ms. Taylor was obligated to repay the initial $5,000.00 that Sallie Mae disbursed to her in July 1996.

The bankruptcy court concluded that a violation of § 525(c) also occurred when Sallie Mae declined to grant Ms. Taylor a second PLUS loan in the absence of her providing the signature of a credit worthy endorser or explaining the extenuating circumstances, holding that the denial was based on her bankruptcy status and a delinquent account that had been discharged.   The court erroneously concluded that Ms. Taylor would have to satisfy 100% of her debts or demonstrate that the debts had been discharged before she would be eligible to receive a PLUS loan--a conclusion unsupported by the language of the regulations.   In so holding  it ignored provision for flexibility in determining extenuating circumstances (updated credit report, statement from creditor that debtor has made satisfactory arrangements for repayment of debt, satisfactory statement from borrower explaining any delinquencies, etc.).   34 C.F.R. § 682.201(b)(vii)(F).

The court also erred in concluding that the co-signing option contained in § 682.201(b)(i)(vii) denied the student loan to the debtor.[19]   The debtor, not the co-signor, receives the PLUS loan and the disbursement from the loan. It is the debtor who remains primarily responsible for the debt repayment

---

[19]   The court concluded that the loan was approved to the co-signor.

The co-signor is responsible for the repayment of the loan only if the debtor fails to do so.  There is no denial of a loan in violation of § 525(c).

**B.     Under The Facts In This Case Sallie Mae Did Not Violate Section 525(c)**

Sallie Mae declined to approve Ms. Taylor's PLUS loan application because the Trans Union credit report stated that she was 120 days delinquent on her debt to the City Bank.  In its March 18, 1887, letter Sallie Mae advised plaintiff that she would be eligible for reconsideration if she 1) resubmitted her application with an endorser with an acceptable credit history, 2) submitted an updated credit report indicating that all accounts were current,  3) sent statement that the adverse credit condition had been resolved, or 4) sent a statement from the debtor indicating that she had made satisfactory progress in repaying the debt. Upon receipt of the letter Ms. Taylor should have notified Sallie Mae that all of her debts had been repaid or discharged.  She did not do so.

Too, Ms. Taylor could have submitted the signature of her mother as an endorser to Sallie Mae.  She did not.  The bankruptcy court erred in finding a violation of § 525(c) when Ms. Taylor could have easily satisfied the criteria set forth in 34 C.F.R. § 682.201 by submitting her mother's endorser addendum.  By not following through and submitting the endorser form Ms. Taylor has not demonstrated she was denied a loan because of her bankruptcy status.

**C.     The Bankruptcy Court Erred In Concluding That § 525(c) Requires
The Lender To Determine That A Debt Is Dischargeable**

The bankruptcy court concluded that it was not reasonable for Sallie

Mae to deny Ms. Taylor a loan without further investigation.  It found that

§ 525(c) language explicitly places the burden upon the government or the person

engaged in a business to determine whether a debt is dischargeable.  It reasoned

that "dischargeable" places the burden of establishing eligibility or ineligibility on

the government.  According to the court Sallie Mae's reliance solely on the credit

report violated § 525(c).

The bankruptcy court's holding is error.  The question is not whether

the loan was dischargeable but whether Sallie Mae "knew" or had "reason to

know" that Ms. Taylor's loan to the bank had been discharged.  The Trans Union

credit report failed to indicate the bank loan was discharged,  and Ms. Taylor

failed to provide Sallie Mae with information that the loan had been discharged.

Requiring the government to carry this burden is too heavy.  Had Trans Credit and

Ms. Taylor, Sallie Mae's two best sources, provided the information to Sallie Mae,

Sallie Mae would have had the information it needed to grant Ms. Taylor the

PLUS loan.  Additionally, had Ms. Taylor contacted Sallie Mae at the time she

received the March 18, 1997, letter she could have learned the specific reasons

why the loan had not been approved and provided Sallie Mae with the necessary

20

information to allow timely payment of Sewanee's second semester bill with a

post-petition Sallie Mae PLUS loan.  The court cannot allow the Taylor Court to

unjustifiably create a form of strict liability on the lender.[20]


## IV.   NO PRIVATE RIGHT OF ACTION EXISTS UNDER SECTION 525(C)(1) FOR MONEY DAMAGES

### A.   Section 525(c) Does Not Provide Clear Evidence Of Congress's Intent To Create A Private Right Of Action

The bankruptcy court erred as a matter of law when it recognized a

private right of action to impose damages pursuant to 11 U.S.C. § 525(c)(1).

Although 11 U.S.C. § 362(h) of the Bankruptcy Code provides a debtor with a

private right of action for damages, no similar right exists under § 525 for alleged

violations of the statute.  Clear evidence of Congress's intent to create a private

right of action must exist.  *See Baggett v. First National Bank of Gainesville*, 117

F.3d 1342, 1345 (11th Cir. 1997) (citing *Touche Ross & Co. v. Redington*, 442 U.S.

560, 570, 99 S. Ct. 2479, 61 L. Ed. 2d 82, *cert. denied,* 445 U.S. 904, 99 S. Ct.

3096, 61 L. Ed. 2d 872 (1979) ("[I]mplying a private right of action on the basis of

--------------------

[20]   Although a PLUS loan lender could review the loan applicant's entire bankruptcy file and, then, with the advice of legal counsel, make a determination of the dischargeability of any debt, this process is very time consuming, costly, and unnecessary since the bankrupt debtor and/or his attorney could easily provide that information to the lender.

congressional silence is a hazardous enterprise, at best."). When Congress has

wanted to create private causes of action under the Bankruptcy Code it has done

so. *In re Reyes* 238 B.R. 507, 511 (Bankr. D.R.I. 1999); *Cox v. Zale Delaware,*

*Inc.*, 242 B.R. 444, 447-49 (N.D. Ill. 1999) (Addressing the question with respect

to § 525, the district court stated that implied private rights of action are

disfavored in the Seventh Circuit); *Bessette v. AVCO Financial Services, Inc.*,

240 B.R. 147, 153-54(D.R.I. 1999) (Addressing the question with respect to § 524,

the district court noted that the First Circuit held "there is a strong presumption

against implying a private right of action").

Section 525(c) clearly does not create a private right of action to

collect damages for violations of the statute.  It simply states that a governmental

unit that operates a student loan program or a person engaged in a business that

makes student loans may not **den**y a loan because of that person's bankruptcy

status.  11 U.S.C. § 525(c).  (Remember  no intention to create a private right of

action exists in the legislative history.)

**B.**   **Section 105(a)[21] Cannot Be Used To Create Substantive Rights That Are Not Explicitly Created in Title 11**

The bankruptcy court relied on § 105(a) of the Bankruptcy Code as authority to award plaintiff damages, citing *In re Hopkins*, 66 B.R. 828, 833-34 (Bankr. W.D. Ark 1986)[22] and *In re Exquisito Services, Inc.*, 823 F.2d 151, 155 (5th Cir. 1987) ("[C]ourt has broad power to ensure debtor is not unduly denied benefits which inure to him under the Bankruptcy Code") [23] as additional authority.  Neither court, however, addressed the issue of whether a private right of action exists under § 525(a).  There is no justification for relying on *Exquisito*

---

[21] "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

[22] *Hopkins* found that the bank violated 11 U.S.C. § 525(b) in terminating a bank employee because of the bankruptcy filing.  The court noted that other courts had entertained requests for damages for alleged violations of 11 U.S.C. § 525(b) and 525(a) and sometimes provided relief. 66 B.R. at 833.  The court, however, denied plaintiff's request to hold the bank in contempt and never reached the question of whether a private right of action exists to collect damages under § 525(b).  66 B.R. at 834.

[23] In *Exquisito Services* the Fifth Circuit affirmed the decision of a bankruptcy court which ordered the Air Force to exercise its option to continue its contract with the plaintiff based upon the Air Force's violation of § 525(a), relying on § 105(a).

*Services* to award damages in the case at bar. *Exquisito Services* awarded no

damages. It simply required the Air Force to exercise its option with plaintiff.

823 F.2d at 154, 155.

It is error for the court to rely on § 105(a) to confer a private right of

action to collect damages. *Bessette*, 240 B.R. at 156, (Section 105 is not to be

used for the purpose of crating private remedies that are not expressly or impliedly

created in other provisions of title 11). *See Walls v. Wells Fargo Bank N.A.*, 255

B.R. 38, 2000 WL 1584576, at 6 (E.D. Calif. 2000) ("As the Supreme Court has

repeatedly emphasized, the 'fact that a federal statute has been violated and some

person harmed does not automatically give rise to a private cause of action in

favor of that person.'").

## V.   EMOTIONAL DISTRESS DAMAGES ARE NOT RECOVERABLE FOR VIOLATIONS OF § 525(C), ESPECIALLY IN THE ABSENCE OF CORROBORATING MEDICAL EVIDENCE

### A.   No Legal Basis Exists To Award Emotional Distress Damages

Other than the *Taylor* decision there is no other reported bankruptcy

case which has permitted recovery for infliction of emotional distress under

§ 525(a) of the Bankruptcy Code. The only instances in which bankruptcy courts

have granted relief for emotional distress damages are for violations of the

automatic stay provisions under 11 U.S.C. § 362(h).  In  § 362(h) cases a split of

authority exists as to whether a person can recover damages for emotional distress.

*In re Aiello*, 231 B.R. 684, 689 (Bankr. N.D. Ill. 1999).  The majority of the cases

have denied damages for emotional distress "where there is no medical or other

hard evidence to show something more than a fleeting or inconsequential injury."

*Id.* at 690, citing *In re McHenry*, 179 B.R. 165 (9th Cir. BAP 1995)[24]; *In re*

*Diviney*, 211 B.R. 951 (Bankr. N.D. Okla. 1997), *aff'd* 225 B.R. 762 (10th Cir.

BAP 1998)[25]; *In re Washington*, 172 B.R. 415 (Bankr. S.D. Ga. 1994)[26];  *In re*

*Crispell*, 73 B.R. 375 (Bankr. E.D. Mo. 1987).[27]  The *Aiello* court stated a rule of

law for the award of emotional distress damages for violations of § 362 derived

from holdings in the above cases.  The rule of law is set forth below:

---

[24]  Repossession of car was not "actual 'non-economic' damages for violation of (debtor's) fundamental bankruptcy right to be left alone.'"  There was no actual damage, only inconvenience and annoyance.

[25]  Court disallowed damages for emotional distress allegedly suffered as a result of wrongful repossession of debtor's vehicle when there was no medical evidence to support claim.

[26]  The court found the debtor's testimony that she suffered mental anguish as a result of an IRS levy on her wages to be insufficient to establish actual damages under § 362(h).

[27]  The court denied claim for emotional distress and humiliation suffered when bank froze debtor's bank account and checks were returned unpaid.

> [T]here must be some medical or other corroborating evidence to
> support the debtor's claim which shows that the debtor suffered
> something more than just fleeting and inconsequential distress,
> embarrassment, humiliation and annoyance.  However, if the
> creditor's conduct is so egregious and extreme that one would
> normally expect emotional distress to occur, then the court may allow
> such damages without requiring additional evidence if it finds the
> debtor's testimony to be credible.

231 B.R. at 691.  While acknowledging this decision the bankruptcy court

declined to follow it in awarding Ms. Taylor damages.

No basis exists to award Ms. Taylor damages for emotional distress.

Testimony at trial showed that she experienced only fleeting embarrassment,

humiliation, or annoyance.   Plaintiff provided no testimony of any public

humiliation or embarrassment.  She received no medical attention for

sleeplessness, queasy stomach, inability to concentrate, or other emotional

problems during the period following February 28, 1997.[28]  Furthermore, neither

Sallie Mae nor Chase engaged in conduct sufficiently outrageous to produce

anxiety or emotional distress.  Sallie Mae's March 18, 1997, letter was neither

threatening nor coercive.

Even were Sallie Mae's conduct egregious, there is no basis to hold

Education liable for the actions of Sallie Mae.  Education simply promulgated

---

[28]  Prior to and during this period of time Ms. Taylor and her husband had
experienced difficulties because Mr. Taylor had been indicted for criminal
activities in April 1996 and had lost a second job in the fall of 1996.

regulations.  No representatives of Education wrote plaintiff any letters or discussed her bankruptcy status with her.

Nor did Ms. Taylor suffer any financial damages.  The bankruptcy court concluded that she did not have to pay a higher interest rate, nor was she unable to attain a loan.  This court, therefore, holds that plaintiff failed to establish she suffered damages as a consequence of the cancellation of the first PLUS loan and Sallie Mae's March 18, 1997, letter denying the second PLUS loan.

### B.    The Bankruptcy Court's Award of $12,000.00 Amounts To An Award of Punitive Damages

The Bankruptcy Court's award of $12,000.00 to compensate plaintiff amounts to an award of punitive damages.  Plaintiff had no provable medical damages.  She suffered no financial consequences as a result of Sallie Mae's decision to cancel the initial PLUS loan and its decision not to award her a second PLUS loan.  This award can only be considered shocking!  The award of punitive damages against the United States is explicitly prohibited.  *Kasprick v. United States,* 87 F.3d 462, 465 (11th Cir. 1996) ("The United States cannot be sued for punitive damages unless Congress explicitly authorized such liability.");  *accord Jove Engineering, Inc. v. Internal Revenue Service*, 92 F.3d 1539, 1548 (11th Cir. 1996) ("The United States may not be sued absent a waiver of its sovereign

27

immunity.") The court holds that the Bankruptcy Court's award of $12,000.00 is reversed.

## VI.   THE BANKRUPTCY COURT ERRED IN RULING THAT IT POSSESSES JURISDICTION TO AWARD ATTORNEY FEES

By oral opinion following the August 8, 2000, argument the bankruptcy court ruled that it possessed jurisdiction to award attorney fees against the government pursuant to 11 U.S.C. § 106(a)(3).[29]  Section 106(a)(3) does not provide a waiver of sovereign immunity to award attorney fees against the United States.  The court must cite a separate provision of the Bankruptcy Code contained in § 106(a)(1) to invoke § 106(a)(3),[30] or rely upon a separate statutory provision such as 28 U.S.C. § 2412(d)(1)(A) or 28 U.S.C. § 157(c)(1) to invoke the requisite waiver of sovereign immunity.  In the instant case the bankruptcy court cited none of the sections in 11 U.S.C. § 106(a)(1) or the Federal Rules of Bankruptcy Procedure as a basis for the award of attorney fees against the government in this

---

[29]  "The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages.  Such order or judgment for costs or fees under this title or the Federal Rules of Bankruptcy Procedure against any governmental unit shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28.

[30]  *In re Brown*, 211 B.R. 1020, 1023-24 (Bankkr. S.D. Ga. 1997).

case.  Ms. Taylor did not allege a cause of action under 11 U.S.C. § 326(h), so that provision of the Bankruptcy Code is unavailable to her.  Also, as stated earlier, § 525(c)(1) does not grant plaintiff a private right of action to collect damages, including attorney fees.

Since no section of the Bankruptcy Code has provision for the award of attorney fees against the government the question must be decided within the context of § 2412(d), not 28 U.S.C. § 2412(b).  The Bankruptcy Court, however, held that it lacks jurisdiction to enter a judgment for attorney fees because bankruptcy courts are not courts within the meaning of 28 U.S.C. § 2412(d)(1)(A).  *Gower v. Farmers Home Administration In re Davis)*, 899 F.2d 1136, 1139 (11th Cir 1990), *cert. denied*, 498 U.S. 981, 111 S. Ct. 510, 112 L. Ed. 2d 522 (1990);[31] *see also, Internal Revenue Service v. Bricknell Investment Corp. (In re Bricknell Inv. Corp.),* 922 F.2d 696, 701 (11th Cir. 1991)("[B]ecause a bankruptcy court is not an Article III court, it cannot be considered a 'court of the United States' for purposes of awarding fees under § 7430."); *Bowen v. Commissioner of Internal Revenue*, 706 F.2d 1087, 1088 (11th Cir. 1983)(Non-Article III tax court did not have jurisdiction to award attorney fees under EAJA).

---

[31] The *Davis* decision is a minority view concerning the bankruptcy court's jurisdiction to entertain EAJA fee applications.

The *Davis* courts recognized two possible methods by which a bankruptcy court might validly entertain an EAJA application: 1) application of 28 U.S.C. § 157(c)(1) by which the bankruptcy court may make findings or fact and conclusions of law to the district court for determination; and 2) referral of a non-core proceeding from a district court, with consent of all parties, to a bankruptcy judge pursuant to 28 U.S.C. § 157(c)(2).

Education declined to accept the bankruptcy court's exercise of jurisdiction in accordance with § 157(c)(2), and the bankruptcy court failed to follow the procedures set forth in § 157(c)(1). Accordingly, since the United States did not waive its sovereign immunity the court's decision awarding Ms. Taylor attorney fees is a nullity and is reversed.

## VII.  THE COURT ERRED IN CONCLUDING THAT EDUCATION'S POSITION DURING THIS LITIGATION IS NOT SUBSTANTIALLY JUSTIFIED

### A. The Government's Position Is Well-Supported By The Law

In distinguishing between § 525(a) and § 525(c) the government relies on the well-settled principles of statutory interpretation that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally

30

and purposefully. *BFP v. Resolution Trust Corp.*, 511 U.S. at 537;  *City of Chicago v. Environmental Defense Fund*, 511 U.S. at 338; *Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed.2d 17 (1983).  The language of the statute is the most persuasive evidence of Congress's intent.  The plain language of the statute must prevail. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S. Ct. 3245, 73 L. Ed.2d 973 (1982); *Ratzlaf v. United States*, 510 U.S. at 147-48; *National Coal Association v. Chater*, 81 F.3d 1077, 1082 (11th Cir. 1996); *Matter of Poole Funeral Chapel, Inc.* 63 B.R. at 532.

**B.      The Court Erred In Failing To Acknowledge That In Cases Of First Impression, Such As This One, The United States Position Is Presumptively Justified**

If the position of the government is reasonably legal and the question is being addressed for the first time, the position of the government is presumptively substantially justified.  *Hyatt v. Shalala*, 6 F.3d 250, 256 (4th Cir. 1993);  *TKB International, Inc. v. United States*, 995 F.2d 1460,  1468 (9th Cir. 1993); *Stebco, Inc. v. United States*, 939 F.2d 686, 688 (9th Cir. 1990); *Trahan v. Brady*, 907 F.2d 1215, 1218-20 (D.C. Cir. 1990);  *De Allende v. Baker*, 891 F.2d 7, 12-13 (1st Cir. 1989).  This court agrees with the Fifth Circuit which has held that when the issue of statutory interpretation is one of first impression (not having been addressed by any court) that principle is even stronger.

*Griffon v. United States Health Dept. of Health & Human Services*, 832 F.2d 51,

53-54 (5th Cir. 1987).  The government's position is sound.

## CONCLUSION

Of all the issues listed at 2-3 of this opinion, only two can be

answered affirmatively:  1)  The bankruptcy court erroneously awarded plaintiff

$12,000.000 in emotional distress damages unsupported by the record and case

law (# 6);  and, 2)  The position of Education is substantially justified (#8).  The

court has, therefore,  reached the following decisions:

1)　　The Taylor Court erred when it ruled that Education violated
　　　Section 525 (c) of the Bankruptcy Code and when it ruled that
　　　it possessed jurisdiction to award Ms. Taylor emotional distress
　　　damages and attorney fees.

　　　a)　　The court erred when it concluded that Sallie Mae was
　　　　　　prohibited from canceling the second disbursement of
　　　　　　plaintiff's PLUS loan.

　　　b)　　Section 365 (e)(2) expressly permits the termination of a
　　　　　　contract to make a loan after the commencement of a
　　　　　　bankruptcy case.

2)　　The Taylor Court erred when it concluded that by requiring
　　　Ms. Taylor to demonstrate extenuating circumstances or to
　　　obtain a credit worthy endorser, Sallie Mae denied Ms. Taylor
　　　a second PLUS loan.[32]

---

[32]  Ms. Taylor could have easily have avoided being identified as having an
"adverse credit history" by informing Sallie Mae that her debt to City Bank  had
been paid or by submitting the endorser addendum signed by her mother.
Ms. Taylor elected not to follow through in her application.

3)      The Taylor Court erred when it determined that § 105(a) could substitute for the lack of a private right of action under § 525(c) and when it awarded Ms. Taylor emotional distress damages.

4)      The Taylor Court erred when it found that Ms. Taylor proved emotional distress damages in the absence of evidence that she suffered any actual financial injury and when it failed to require her to supply medical evidence to support her claims.[33]

5)      The Taylor Court erred when it concluded that it possessed jurisdiction to award Ms. Taylor attorney fees without identifying a specific provision in the Bankruptcy Code allowing for the award of attorney fees against the government.[34]

6)      The Taylor Court erred when it ruled that the government's position is not substantially justified.[35]

For the above-stated reasons the court reverses the decision of the with respect to whether the position of the Government is substantially justified. The decision of the bankruptcy court is reversed.

An order consistent with this opinion is being entered contemporaneously herewith.

---

[33]  The court's award of $12,000.00 amounts to punitive damages--strictly prohibited by 11 U.S.C. § 106(a)(3).

[34]  11 U.S.C. § 106(a)(3) alone does nor provide a basis for jurisdiction to award attorney fees. *See In re Davis*, *supra* at 30-31.  In the absence of consent under § 157(c)(2) the bankruptcy court can only make recommendations concerning the award of attorney fees. *Davis*, 899 F. 2d at 1141.

[35]  The government's position is well supported by the facts and the law.

DONE and ORDERED this 21st day of May 2001.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.

34